Good morning, counsel. Good morning. May it please the court, my name is Robert Stockman here on behalf of the U.S. Fish and Wildlife Service. With me at counsel's table is Rebecca Noblin here on behalf of the environmentalist organizations that have intervened in the case. My intent is to speak for 12 minutes in the opening to relieve three minutes for Ms. Noblin in the opening and reserve five minutes for rebuttal for myself. I'm eager to address any questions from the court. I know there are a lot of issues presented in this case, but I'm First, the service's findings that units two and three contain features essential to the conservation of the polar bear. And second, the service's consultation with the state of Alaska through the section four process. But before getting into the details, I think it's helpful to clarify the limited challenges that are really presented here and look at the overall decision. Here, the service designated the critical habitat for the polar bear, which is a species that is specifically threatened by its loss and destruction of the habitat. And in doing so, the service had to make a number of judgment calls based on limited data. This is an incredibly harsh and unforgiving environment. It's constantly shifting. Very few humans live near this habitat, and the polar bears have adapted to this incredibly dynamic environment with huge movements, huge ranges, dispersal and the occupation of huge areas. So that's part of what the background to this. The primary issue on appeal is whether, based on the best available science, the service reasonably identified units two and three as specific areas containing features essential to the conservation of the polar bear. So, counsel, my understanding of the district court's issue with the designation was that it was not specific enough. What's your response to that? I think the answer to that is that it was as specific as it could be based on the available science at the time, which harmonizes the various requirements of the Endangered Species Act. Specific also requires that it be clear to the regulated community, and the service has interpreted that to require it to develop specific and clear maps. Here, it is as specific as it can be based on the science. From your understanding of the district court's criticism of the designation, what was missing from... What specifically could have been done by the agency that wasn't done to make it more specific? Well, I think there were two problems, as we understood it with the district court's order. One is that he seemed to desire a kind of very specific documentation of exactly each and every area that's going to be used by the bear. And that's scientifically impossible. The bear has incredibly variable movements. It wanders over these areas. So that's one problem. That's going to be used or that... That is used, is used by the bear. So it's almost like a Swiss cheese, which isn't really habitat. Habitat is the environment in which the bear lives. The other problem I think the district court had is he thought there wasn't evidence of some of the elements in the PCEs. And there, I think he was just... He overlooked evidence in the record. And partially, this is the district court, went on a theory that wasn't really presented clearly, or it wasn't really the theory we understood the plaintiffs to be presenting. So he thought there was no evidence of two of the elements of PCE2. He thought there was no evidence of access from the shores to the den, which no one had really claimed. And he thought there was no evidence of non-disturbance by humans, which no one really had claimed. And I think as our brief makes very clear, there's ample evidence in the record that both of those elements are in Unit 2 and are widespread throughout Unit 2. Now, are we just talking about Unit 2 now, which is denning? I'm starting with Unit 2, the terrestrial denning, which I think was the focus also in some ways of the district court order. Right. And there's just multiple lines of evidence support the designation of all of Unit 2. So first, you have the fact that the bears successfully den there, which shows that Unit 2 has the elements necessary for successful denning. But then you also have multiple radio telemetry studies that show the bears moving through Unit 2 and going from the shore to the dens. And then you also have the den site studies, which analyzed aerial maps and tried to identify where potential den sites are. And one thing those studies show is that first they're spread widely throughout the area and the vast majority of Unit 2, although most of it isn't itself a potential den site, is close enough to a potential den site that human disturbance could, if unmanaged, cause problems. So, and then the next is the extent there is human activity in this area at Dead Horse, at the native villages. There's lots of evidence that the bears do use the area and wander through and nearby. We have that from our management documents. We also have that from traditional ecological knowledge from the native Alaskans who have reported bears moving by their villages and moving in the area. So even though it's disturbed, it's non-disturbed? I'm not quite sure I understand that. So I think this is the one element that I think is a little confusing, but I think can be discerned from the record. The service said non-disturbance is really important for the bear and important for its conservation. But it didn't mean to say, and it didn't say that, this court has recognized that the fact that something is important doesn't mean that it's the only thing that's important or it's the only element that an area needs. So the vast majority of both these areas, Unit 1 and Unit 2, is undisturbed and provides that undisturbed location for the bear. But to the limited extent there are areas near human development, the level of disturbance isn't sufficient that that would, that renders it useless to the bear. The bear still moves through those areas and still uses those areas as a way for access. Am I correct that the dead horse is not used all the time, all year round, is that correct? I think that's... By the oil company. Well, it's not, I think there may be someone in, dead horse, first of all, is a very unclear term. It's an area in North Alaska. It's not used all the time. It's not used systematically all the time. And in particular, the parts that are designated aren't used all the time. So for example, they invoke the dead horse airport, but that's south of the designation. That's not in the designation. So the areas that were included are not used systematically. And to the extent there are, we get multiple reports that bears do move through this area. And if we had to exclude areas because they were imperfect for critical habitat, that's not what the statute says. It doesn't say it has to be ideal habitat or perfect habitat. It's also the area where the polar bear is most, where management is most important for the conservation of the bear. That's exactly where we manage people and ensure that they take steps to ensure they don't harm the bear and that the bear doesn't come to the human nuisance. So it would be very strange to say, well, we're going to exclude the very places where conservation measures are most important. I don't think that's what the statute supports. What about the five mile increments? Why isn't that too much? The five mile increment, I think, is reasonable because it's within the, under this court's precedent in Delta smelt. The question is, is it the kind of decision that is within the reasonable range supported by the data looking at it as a whole? And here you had a variety of scientists sit down and look at the various dens, and they found two very distinct groups, right? East of the Kavik River, it came in about 20 miles. West of the Kavik River, it came in about five miles. And so they chose five miles as an increment. Now, that's partially to build in a buffer zone, right? They say, well, it's only 2.8 miles in west of the Kavik River. And when we say 2.8 miles in, are we talking about an actual den? Is that what we're talking about? We're talking about the confirmed dens that were relied on in doing that study, which are only dens identified through radio telemetry. And the reason we did that is because radio telemetry is less likely to be biased. And we're pretty clear that there are other dens. There are definitely other dens. I mean, dens have been as much as 50 miles inland. Multiple things show dens much more inland. And one thing is, here we have plaintiffs arguing that this is too big, but it could have been argued that it was too small. What science specifically or study supports the extra two miles, 2.2 miles? Well, so first there's a mile for the buffer. And lots of people agree that a mile-long buffer around dens is important to preserve the bear. And we have the snowmobile reaction studies, which aren't perfect because it's not about denning bears, but show the bears reacting on average at about a mile. But some bears react as much as five miles or five kilometers away. So we know that some area is needed for non-disturbance. And then the other thing is you want to build in a little bit extra because we have such a small data set to work with. We know that we only are tagging or getting data on maybe 20 to 40 bears a year. And there's 240 bears estimated that den in this area. And they do move inland. So this is within the data justified range. It was the best we could do with the data available. And I think this is a classic example of a best available science question, right? Is there a better methodology? Is there a better approach? And what the plaintiffs have studiously refused to do in this case is identify a better approach or a better way of doing this that would have allowed us to do a better job. And we have to designate critical habitat. We have to act on what data is available at the time, even if it's not as perfect as we would like it to be. This is a little confusing. On one side of the river, there are den sites that are farther in than on the other side of the river. On average, yes. Now, I will say there are den sites that are further in, though they aren't in the particular study that the final mapping was done on because they weren't telemetry dens, on the west side as well. And there are dens that have been further inland with respect to Barrow. And for that matter, there's dens west of Barrow that were excluded because on balance, we don't think there's...it's critical habitat. We don't think that the denning on the west of Barrow is essential to the conservation of the bear in light of all the evidence before the agency. I also think it's important to remember that the ultimate question is, is Unit 2 reasonable? And the agency used its methodology to map it, but its ultimate conclusion was Unit 2 contains all the elements necessary for the terrestrial denning habitat. And that was reasonable. It was built on all the various lines of data that the agency laid out. Now, the district court said all the elements weren't there, is that... He did. And what did the district court say and why is the district court wrong? The district court said first that there was no evidence of access from the coast to the dens. And that's just incorrect because the radio telemetry data shows the bears move throughout that whole area. And then the other thing the district court said is there's no evidence of non-human disturbance. But that's also incorrect because, I mean, among other things, 53 percent of the denning habitat is in the ANWR, which is not exactly a developed place. This is a very undeveloped place. No one argued that there's human disturbance throughout Unit 2. I mean, that is just factually, clearly incorrect. I have more to speak about, but I might save some time for rebuttal and let my colleague get up if that's acceptable. Good morning. May it please the court. I'm Rebecca Noblin and I represent the Environmental Group Intervenors. I'd like to make just two quick points, one about institutionalized caution in the Endangered Species Act and one about the importance of critical habitat. Polar bears are going to go extinct if we don't do something. Federal scientists tell us that two-thirds of the world's polar bears are going to be gone by 2050, and that includes nearly all of the polar bears here in Alaska. In the context of this dire situation, the service designated a central polar bear habitat that complies with the letter and the spirit of the Endangered Species Act, which sets a policy of institutionalized caution. In passing the act, Congress established that federal agencies have a duty to give the benefit of the doubt to listed species. According to the Supreme Court, all federal agencies must afford first priority to the declared national policy of saving that endangered species. When science is uncertain, the law requires federal agencies to cut in favor of listed species. Here, some of the world's best polar bear scientists looked at the available data and determined that this habitat is essential to protect polar bears. Although the scientists couldn't determine the exact paths polar bears might take across their vast ranges, or the exact places they might hunt or den in any given year, the scientists rationally designated those areas most likely to provide those services over the course of a polar bear's lifetime. Polar bear biology doesn't allow for more specificity and the Endangered Species Act doesn't allow us to demand it. My second point is that critical habitat provides real benefits to polar bears. Congress was right when it found that the most important factor in ensuring a species survival and recovery is the protection of its habitat. Studies have shown that species with designated critical habitat are more than twice as well. And critical habitat not only provides for Section 7 consultation, it also gives the service the opportunity to holistically determine which areas are essential and puts the public and land managers on notice that this habitat is important and needs to be treated with care. The goal here is, there seems to be a little bit of tension here between what you are arguing to be the goal and what the district court saw as the goal. The goal, I take it, is to conserve the species and to protect it and to let it expand? Is that rather than just making sure that the existing polar bears continue to exist? Absolutely. The goal of critical habitat is to ensure the conservation of species. And courts have held that conservation means not only survival, but recovery. And recovery means to get bigger? Recovery means... What? Right, right. So basically, if a species population is depleted, then you have to recover it to the numbers that it was before it began. So it's no longer threatened? Right, exactly. So it's no longer threatened or endangered. The only way to save polar bears is to reduce our greenhouse gas emissions. But if we want them to survive long enough for that to happen, we're going to have to throw everything we've got at protecting them from other threats. And this legally sound, well-reasoned critical habitat designation is an essential weapon in the fight to save a vanishing species. And it should be upheld. All right. Thank you, counsel. So there's a cross appeal also involved in this case. Do you intend to address the cross appeal at this point as well? Your Honor, I was not planning on addressing it other than through your questions. You're not reserving time for cross rebuttal. But if Your Honors have questions, I'm prepared to take them, of course. Good morning. Your Honors, my name is Jeff Leppo. I will be presenting the principal arguments today on behalf of the broad coalition of Alaska Native organizations, the North Slope Borough, the state of Alaska, the Alaska Oil and Gas Association, and the American Petroleum Institute that are the plaintiff's appellants in this case. We've allocated our 20 minutes so that I have 17 minutes and then Mr. Love, who will follow, will have three minutes to speak specifically to Unit 3 issues as they concern the individuals who live and govern on the North Slope within critical habitat areas. To economize our time, the state of Alaska is planning to rely on my arguments and the arguments of Mr. Love in the briefs. If you have questions, I'm here to answer them. Subject to the court's questions, my intention this morning is to address three subjects. First, to very briefly speak to the federal defendant's reliance on the wrong legal standard. Second, to address why the service's preordained decision to designate Unit 2 in minimum five-mile swaths was, as the district court held, arbitrary. And third, if time permits, to quickly address why the service's designation of Unit 3, as the district court determined, was also arbitrary. Before I even dive into the legal standard, I'd like to answer a question that you just asked, Judge Schroeder, and that relates to the purpose of critical habitat and how it concerns the polar bear here. And this case is unique in the sense that the purpose of the Endangered Species Act is to bring, to conserve listed species. And so it is to bring them to the state of recovery. What's unique about polar bears is that the threat that they face is in the future, not in the present. And so polar bears, as the record clearly establishes, exist throughout their today. And so they are in a state of recovery. They're anticipated to go into a state of decline in the future. And that's why they're threatened, not endangered, because there's not a current problem with that. Isn't that important? Wouldn't we want to prevent the threat of endangerment from actually occurring? Of course we do. Absolutely. And all the parties here have a longstanding commitment to the protection of polar bears. None of the parties here are perceived to be a threat to the polar bear. Nobody's anti-polar bear. Nobody's anti-polar bear. My clients in particular defended the listing of the polar bear. So no one's here for that purpose. All these parties have coexisted with polar bears, particularly, of course, the native communities, for centuries. And so they're not the threat here. But what's your point, then, about the fact that any threat is in the future? What is your point in making that statement? I just wanted to be clear that the listing, this designation of critical habitat, isn't about bringing them back to a state of recovery uniquely in this situation. They're in a state of recovery. I'm simply trying to draw that distinction. Speaking to the legal standard. Your clients are who? My specific clients were the Alaska Oil and Gas Association and the American Petroleum Institute. But I'm presenting argument on behalf of all of the clients at this point. I understand, I understand. And their interest is in? Their interest is in operating within polar bear habitat in a way that's safe for humans and that allows for responsible resource development. My first point is the legal standard is the federal agencies are required by the APA to explain cogently the basis for their decision. The plaintiffs contended and prevailed below and we're arguing here that the services designation of polar bear critical habitat is arbitrary and unsupported by a rational explanation in violation of the APA. And moreover, that there are many explanations, including the explanations that Mr. Stockman just provided, are all post hoc rationalizations that can't fill the gaps that exist in the record. Therefore, the claims as the district court held are in violation of the APA's arbitrary and capricious standard. There's an independent obligation and independent of the APA, ESA section 4B2 expressly requires the use of the best available evidence. The failure to use the best available science is a violation of the Endangered Species Act. However, the ESA's best science requirement doesn't supplant the requirements of the APA. So you don't argue an alternative science, you just say that they're not interpreting the best available science reasonably. Well, we're saying that there is no science to support their decisions or that it's contrary to the science. Well, there is some science in terms of, are you just challenged the studies that were done, say the radio? Absolutely not, Your Honor. Absolutely not what? We're not challenging those studies. Our point, and Your Honor brought up the issue of the five mile, the minimum five mile swaths requirement. So that's a good example of the situation. The Fish and Wildlife Service directed USGS, the US Geological Survey, to identify in where the 95 percent denning had occurred on the North Slope to designate Unit 2. There's nothing in the record. There's no science. There are no scientific reports. There's no explanation for where that five miles came from. None. So the USGS, and those five miles came before they knew where the 95 percent denning was. It was an instruction. So USGS, and there's a report in the record, which I strongly encourage you all to... Well, but let me ask you, do you challenge the 2.8 finding of where the dens are? No, no. Of course, the first... Would you draw the line at 2.8? Well, that would be one option available to them, of course. What's the other option? Well, so just to be clear, so the USGS found that 95 percent were within 2.8 miles of the coast in the band between... That seems like a compelling number, within 2.8 miles. Well, it would be, if you could demonstrate... Here's the other problems with it, right? They identified what the PCEs are, the primary constituent elements. Some of it is polar bear critical habitat itself for denning. And it's undisputed that it's demonstrated, and Judge Beislein found this to be very important, that only 0.2 percent, 0.2 percent of that area is actually where polar bears den. That's the habitat, not... Well, sure, because it's a huge area and there are only 200 or so polar bears. But they... Your Honor? What we're talking about is what is suitable for them to den. So the 0.2 percent is the habitat that could be used for denning, not just where they've denned. Oh, and not in excluding access and all that. That's right. All right. All right. Do they have to get to the dens? They do. Of course they do. It's not just where they den, they have to... Absolutely. But then they need to explain in the record how they concluded that the other 99.8 percent provides those things. And there's no explanation in the record for that. There's no explanation in the record for how the other 99.8 percent of Unit 2 provides unobstructed access between dens and the coast, or how it provides areas that are free from human disturbance. And in fact, we can talk about that five mile area. If you're looking for access between dens and the coast, and you've identified that the dens are 2.8 miles inland, and you've designated an area that's 44 percent further inland of the dens. In other words, it can't be providing access to the coast. It's the other direction. But if you're looking at all of these, the features, the four features, I mean, I don't know that it seems like you're dividing and conquering, at least this is your opportunity to tell me why you're not, that you're not doing that. I mean, if you look just for unit, with respect to Unit 2, if you look at the radio collared studies, I mean, they're all over that area. And so I'm just trying to figure out, would you have us not look at that, or not have them, not us, not have them look at that. But it seems like those studies, which is the science that is best available to them, don't see anything else offered that you're pointing to. I guess you're just saying that that doesn't, that their determination was completely unreasonable. No, that's not what I'm saying, Your Honor. Absolutely not saying that. First of all, there's no determination in the record that they wander throughout all this area and that, in fact, the PCE, Your Honor, is unobstructed, undisturbed access between den sites and the coast. That is a very different thing than saying that they move through the area. Polar bears, not denning polar bears, but polar bears move through the area. That's not the PCE for Unit 2. Unit 2 is access from den sites, which is 0.2 percent of this area, to the coast. That's how they defined it. And they have redefined in their briefs the notion that there's lots of evidence that polar bears move all over the place. Well, there is. But you're measuring den sites as the actual site. Well, the founding point for Unit 2 is its denning habitat. It's not any habitat, right? It's habitat. It's not just the sites, it's not just like the case with the owls and the trees. Yes. And again, the evidence is, Your Honor, that all of the denning habitat, all of the denning habitat, not just where there are dens, but all of the denning habitat is 0.2 percent of Unit 2. It's not, I'm not selecting only the places they've ever been. I'm taking all the places that ever could be dens is 0.2 percent. But they don't magically, the problem I'm having with your argument is they don't magically appear at the denning sites. They have to get there, they have to leave there, and they don't necessarily get there by the same route every time. You're wrong. That's the problem that I'm having with your argument. But the agency's responsibility is to select those specific areas on which are found the PCEs. So they identified the PCEs, and it's their obligation to explain in the record, this is basic APA requirement, how they concluded things. When they designated Unit 2, what they said is 95 percent of the dens occur in this area, and we're picking it in five-mile bands. That's it. That's all they did. They didn't, there's no explanation in the record. Well, sure there is. I mean, it seems like there is. That there needs to be, based on the studies, I mean, just cutting it off at 2.8, knowing that there's dens that go as far as 50 miles in, that there seems, I mean, based on what their studies are saying, some area of what I think is referred to as a buffer zone, or buffer area. There's the no disturbance plus the buffer. Okay, the no disturbance zone is in Unit 3, and we're talking about Unit 2. There's no explanation in the final rule that the five miles was selected to provide a buffer, or that it was selected to provide access. This is a post hoc rationalization. It appears in their briefs. It sounds great. It isn't a determination that the service made. It doesn't appear in their rule. So, are we talking about one side of the river now with the? The five miles is on one side of the river. The 20 miles is on the other. The 20 miles is on the other. That's right. And so, what is it that you, what was it that the comment said that the agency should have done here instead of the five miles? Okay, again, it's their obligation to find the specific areas where these occur and not. Well, it just doesn't seem arbitrary and capricious. If the bears are, if the sites are 2.8 to say we're going to have five. It just doesn't. Well, there's no explanation for that five. Why not 10? Well, isn't there, I'm sorry. Yeah, go ahead. But isn't, wasn't there a reference to a Derner study that said 95% of mainland dens were within five miles of the coast? The Derner study says that 95% of the dens are within 2.8%. They actually looked where the denning habitat is as opposed to where the dens are. Right? And what they found is it's 0.2% of the area. Derner didn't look for 95% of where the prior denning had occurred. So if they had said 2.8, you wouldn't be making this argument? We wouldn't be making the argument that the five miles is arbitrary. Absolutely not. Right, but you wouldn't be making the argument that 2.8 is arbitrary. Not the 2.8, but you have to look at the interstitias, right? Okay, so they come out to 2.8. Then the question is, what about these areas in between the dens? And there is a lot of human involvement in those areas. So the other piece of this, Your Honor, is it's not that there aren't areas where they go or that there aren't areas that are free from involvement. But on the North Slope, there's a large industrial complex up there and there are villages that people live in. And there is a federal program, Your Honor, that specifically exists to look for polar bears because they are the apex predator of the Arctic. They eat people if they're allowed to. And they look for them. And when they see them come in the area, they monitor them. And if they don't move out of the area, they engage in an increasing set of protocols in order to harass them away so they don't den in those areas and so they don't go in those areas. And so you can't... I thought that those areas had been excluded. No, that's not right, Your Honor. They excluded buildings and they excluded the villages themselves. But in fact, they are hazed away from areas approaching those areas because, of course, children play and people move outside the absolute boundaries of the villages and... Right. We've had a lot of litigation of polar bear issues under the Tort Claims Act. But... That may be, Your Honor. I'm not familiar with those. But I can tell you that they are a predator. Yeah, well, I understand that, but I'm not quite sure what your... My point is that these bears are hazed away from these areas. It can't be both critical habitat and areas where if a polar bear moves into that area, they are hazed away so that they don't den and so that they don't travel through that area. And there are large areas of this. Okay, there are large areas where that's not true. But the Fish and Wildlife Service has the capacity, has the information to know where these areas are because there's a federal program that's existed for decades in which they know exactly where people haze where they operate and where they haze polar bears away. And it is beyond the limits of these villages. And it is beyond the edge of every building. And it can't... It's the height of arbitrariness to designate an area where you haze bears away as critical habitat. And that's what they've done. All right, I'm going to allow Mr. Love to go forward. Thank you. Thank you, Your Honor. May it please the court, Matt Love representing the North Slope Borough. The North Slope Borough requests that this court affirm the district court's vacature of the critical habitat designation based upon the additional grounds that the designation of areas within one miles of Alaska Native villages is arbitrary and capricious and lacks a rational basis. The North Slope Borough is a area-wide local government akin to a county in the lower 48s with jurisdiction over approximately 89,000 square miles of Arctic territory. The majority of the North Slope Borough residents are Alaska Natives. Alaska Natives and their ancestors have been the Arctic's primary conservation stewards for thousands of years, carefully balancing subsistence needs and cultural traditions with profound respect for the polar bear. There's nobody in this case that has invested more in the conservation of the species or has more interaction with the polar bear than Alaska Natives. The North Slope Borough is strongly committed to measures that conserve polar bears. However, this flawed designation will harm Alaska Natives and North Slope Borough residents, the very people whose livelihoods depend upon the designated lands. As the district court stated, the designation went too far and was too extensive. The prime example of this is the designation of areas within one mile of Alaska Native villages as Unit 3 non-disturbance zone critical habitat. In these areas, for human safety and bear safety, active, diligent, and constant bear deterrence occurs. In these areas the communities use snowmobiles and other noise-making devices to deter polar bears. In these areas, if a bear stays too long, it can be killed for public safety concerns. Unit 3 and the non-disturbance zone were predicated upon being free from human disturbance. The service concluded that unless the habitat was free from human disturbance, that the habitat would not function or be suitable for denning, habitat, and movement. Let me make sure I understand. Your position here is you're speaking only to Unit 3 because your clients are concerned with the barrier islands? That's correct, Your Honor. Yes. And the villages, more specifically, and the villages that are located within the barrier islands or in the non-disturbance zone around the barrier islands. So I'm trying to figure out, are you saying there should be no non-disturbance zone? No, Your Honor, not necessarily. I'm saying that the record doesn't support the inclusion of a non-disturbance zone around Alaska Native villages because the record demonstrates that these areas are disturbed. The services concluded in the final rule at ER 84 that the functional usefulness of the habitat requires that an area be free from human disturbance. Yet they designated areas that are not free from human disturbance, that these areas lack the biological and physical features necessary for the conservation of the species, and these areas do not fit within the definition of critical habitat. Okay. When your colleague was speaking earlier of the places designated where the polar bears have to be hazed away, is that also the barrier islands or is he talking about Unit 2? In Unit 2, there are villages and then there's dead horse. There is human development in Unit 2. My focus right now is on Unit 3 and the villages that are located within the barrier island and the non-disturbance zone. So there's simply no rational basis for designating areas within one mile of Alaskan Native villages as critical habitat. Thank you. Thank you, Your Honors. In response, I'd like to focus on the human disturbance issue. The vast majority of both Units 2 and Units 3 is not disturbed by human activities the vast majority of the time. I think that's, everyone agrees about that. The question is, should the service have then not designated the places closest to the native villages, and I think some of the oil companies would have liked exclusion for certain projects. And the service wrestled with this exact question. And it concluded, and I mean, I think this is in the excerpts of record in the final decision document at places like ER 84 through 89. They talk a lot about these issues, among others. They concluded that they were going to keep them, and part of that is this is exactly where conservation measures are in place and where conservation measures are most important. There's ample evidence that polar bears do, in fact, use these areas, and if not managed, would use them more. And I mean, I think we're all in agreement about that. And then there's a role here for conservation, for hazing the bear away so it doesn't get used to human interaction too much. But the record is filled with examples of bears coming to these native villages, to Air Force bases in this area, to various places. I think excerpts of record 189 through 205 has some very interesting stuff on this. Excerpts of record 309, 377. So there are huge aggregations. In fact, in some ways, native villages can become a draw for bears. So because they leave whales, and then the bears feed on the whales. So the question was, do you exclude it because it's imperfect, because we don't want them living there? Or do you keep it because they do want to be there, and we have to engage in active management to haze them away? And it seemed very, it would have seemed strange indeed to exclude areas from critical habitat on the basis that you engage in active management to conserve the bear there. There's nothing in the critical habitat definition that requires you to exclude places like that. So I think that the service had a difficult decision to make, but it made a reasonable one. And it is, and I think the rule is also 100% clear that the service intends for those very activities to continue. Those management activities will continue. We don't think the critical habitat designation in any way interferes with it. And in fact, the service talked about how it wanted to expand its activities around native villages to ensure that the bear doesn't come into the village. I think it has to do about the assertion by Mr. Lepo that the five-mile increments justification is just post hoc rationalization. I disagree, Your Honor. I think the agency, first, I think there's a little bit of a mistake about the nature of the report. It was developed by USGS, but the report itself is clear that it was in consultation with USFS, that they were going back and forth, and it has polar bear scientists as the authors. So the second part is the record itself, that excerpts of record 87 and 83 and 84 talk a little bit about why they chose this methodology. And in particular, I would point you to excerpts of record 87 where they say, we did this because, well, in 84 they say, this accurately captures the major denning areas and therefore the feature is essential. And at 87 they say, we have a limited number of radio collared female polar bears. In any given year, approximately 20 to 40 dens are located, but that is a small subset of the total number. And so there they were saying, we have very limited data, so we're going to choose a conservative estimate to address that limited data. And that is exactly the kind of thing this court upheld in the two Delta smelt cases. I also think that they talk about, at 87 as well, how these areas are crucial because it's not just denning and it's not just access, though both those things are crucial, but it's also a lack of disturbance in areas, quote, areas to acclimate the cubs after den emergence, end quote. That's an excerpt of record 87. So they couldn't just choose at the very absolute stop of the den. And this assumes that bears kind of will come straight from the shore immediately to the den, settle down, somehow be impervious to disruption, and then go right back out to the ice. But that's just not true. Bears spend up to eight days around the dens acclimating the cubs and moving them around. So they had to build in space for that. And I guess the mother bear has to eat something then, doesn't she? I don't know how much she gets to eat at first. She relies a lot on fat during the early years. But these radio collar studies, I think Mr. Lippo was asserting that those are just polar bears, not necessarily denning, but just their activity. What's your response to that? So the studies study different things. A lot of it is movement. And it establishes that they move throughout this area and actually much further inland. But then we can also identify when they den. And the way you identify that is they stop. And they stay very still for a long period of time. And you can establish their denning. I mean, the polar bear doesn't generally hibernate. It only dens when it's giving birth. So that's how we know that it helps us track down not just their long movements, which are not perfect straight lines, but also they stop, they stay there. And then usually we send someone out to see if we can establish whether they successfully had cubs or not. Okay. When you said that the radio telemetric studies, that, when you refer to those, you're talking about the bears that have the collar on them so that you can follow them? Yes. We can put collars around adult female bears and then follow them as they go through their course, and then when they stop, you can assess that they have stopped to den. And we then go out and confirm that there was a den there later. So that's how the radio telemetry both tells us where they move and lets us infer when they den. And they don't hibernate. They just give birth. They give birth. I mean, they kind of, I mean, then they stay still. But the normal, or sorry, adult male bears, for example, don't hibernate annually. And adult females that didn't gain enough weight or didn't mate don't hibernate annually, as a general matter. So if they stay still, you can be pretty confident that they are giving birth and raising cubs. So I see my time is up. I would like to just quickly sum up. The polar bear is a threatened species facing destruction of its habitat. Substantial evidence in the record establishes that the designated habitat is occupied by the bear, that it contains features essential to the conservation of the bear, and that those features may require special management. The court should uphold the critical habitat designation so the government can start relying on it during its ESA Section 7 consultations. All right. Thank you, counsel. Thank you very much. Thank you to all counsel. The case just argued is submitted for decision by the court.
judges: Rawlinson, Murguila, Schroeder